## UNITED STATES DISTRICT COURT FOR
## THE DISTRICT OF COLUMBIA

| | |
|---|---|
| GAIL C. SWEENEY ESTATE MARITAL TRUST, derivatively on behalf of FEDERAL NATIONAL MORTGAGE ASSOCIATION 5237 S. Geneva Street Englewood, Colorado 80111, <br><br>      Plaintiff,<br><br>      vs.<br><br>UNITED STATES TREASURY DEPARTMENT and NEAL S.WOLIN , in his capacity as Acting Treasury Secretary 1500 Pennsylvania Avenue N.W. Washington, D.C. 20220,<br><br>      Defendant<br><br>   *and*<br><br>FEDERAL NATIONAL MORTGAGE ASSOCIATION 3900 Wisconsin Avenue N.W.; Washington, D.C. 20016 *and* FEDERAL HOUSING FINANCE AGENCY and EDWARD J. DeMARCO, in his capacity as Acting Director of FEDERAL HOUSING FINANCE AGENCY 400 7th Street N.W. Washington, D.C. 20024<br><br>      Nominal Defendants. | Civil Action No.: _____<br><br>   **JURY TRIAL DEMANDED**<br><br>   **VERIFIED SHAREHOLDER**<br>   <u>**DERIVATIVE COMPLAINT**</u> |

Plaintiff, by its attorneys, brings this derivative action on behalf of the Federal National

Mortgage Association ("Fannie Mae" or the "Company") against the United States Treasury

Department ("Treasury") and other nominal defendants (collectively "Defendants"), and

alleges as follows based upon, *inter alia*, the investigation made by and through its attorneys:

## INTRODUCTION AND OVERVIEW OF THE ACTION

1.      This derivative action for breach of fiduciary duties arises out of Defendants' continuing failure to sell, auction or otherwise dispose of over $3 billion of low income housing tax credits ("LIHTCs" or "LIHTC investments") of Fannie Mae.

2.      In the fall of 2009, it was widely reported that Fannie Mae had reached an agreement to sell approximately $3 billion of low income housing tax credits to various investor groups, including the prominent investment banking firm, Goldman Sachs, Inc.  The sale of the tax credits would have provided Fannie Mae with much needed cash that it could pump into low income housing investment and revive the market for subsidized affordable housing.  Not only did Fannie Mae approve of the transaction, but Fannie Mae's Conservator, the Federal Housing Finance Agency ("FHFA"), also endorsed the tax credit sale as consistent with the FHFA's mandate to conserve the assets of Fannie Mae.

3.      Despite these benefits, Treasury, Fannie Mae's controlling shareholder, blocked the tax credit sale.  Treasury claimed that the loss of tax revenue to the government would be greater than the gain to Fannie Mae from the sale of the tax credits.

4.      In truth, Treasury's decision was also motivated by another consideration:  the risk of a political firestorm was simply too great for Treasury.  The bursting of the real estate bubble and resulting economic downturn had cost the federal government and taxpayers hundreds of billions of dollars while investors like Goldman Sachs were profiting.  For political reasons, the federal government wanted no fingerprints or even a perception that it had helped to line the pockets of institutional investors like Goldman Sachs.

5.      As the *New York Times* reported on November 9, 2009:

> Treasury officials confirmed on Monday that Goldman Sachs, which reported record quarterly profits last month, has proposed

> buying or at least borrowing tens of millions of dollars worth of unused tax credits from Fannie Mae, the mortgage finance company that is now owned by the government ….
>
> But the political appearances could hardly be worse. Lawmakers in both parties have fumed time and again that Wall Street firms—Goldman Sachs in particular—seemed to be profiting from the mortgage bubble and bust they played a central role in financing ….

6.      Stripped of political implications, however, the sale of Fannie Mae's tax credits indisputably was, and is, a good idea and makes sense financially to Fannie Mae, its shareholders and taxpayers.  The tax credit sale has been  endorsed by the Conservator as consistent with FHFA's and Fannie Mae's ongoing efforts to conserve Fannie Mae's assets, is consonant with Fannie Mae's overall mission to facilitate low income housing, and can be a win-win for taxpayers and Fannie Mae.

7.      The sale of the tax credits also would reduce the amounts that Fannie Mae has to borrow from the government, help stabilize Fannie Mae, help Fannie Mae pay back the monies it received from the financial bailout and/or allow Fannie Mae to pump needed monies into more low income housing.

8.      Moreover, the government, in principle, supports the sale of tax credits to benefit taxpayers and the practice is common in a robust economy.  Further, the sale of the tax credits is in the public interest because it would bolster the secondary market for LIHTC assets, which would substantially increase the universe of LIHTC investors and thereby increase the supply of new affordable housing.  To the extent that the sale of Fannie Mae's tax credits was, or is, being derailed because of the proposed sale to a particular third party (such as Goldman Sachs), the tax credits can be auctioned or otherwise disposed of.

9.      In refusing to allow the tax credit sale and in continuing to block the sale despite

Fannie Mae's continued requests, Treasury breached and continues to breach its fiduciary duties to Fannie Mae's minority shareholders.

10.     As controlling shareholder of Fannie Mae, Treasury owes fiduciary duties to Fannie Mae's minority shareholders to maximize the value of Fannie Mae and to conserve and preserve the assets of Fannie Mae.  In acting as alleged herein, Treasury breached and continues to breach its fiduciary duties to Fannie Mae's minority shareholders by protecting Treasury's own interests at the expense of Fannie Mae's; by pursuing Treasury's policy goals, rather than seeking to maximize value for Fannie Mae; and by wasting and not preserving a multi-billion dollar asset of Fannie Mae.

11.     Treasury's duties have not been vitiated or excused.  There are not different rules for a controlling shareholder when the controlling shareholder is Treasury.

12.     Treasury's conduct is particularly egregious in that its breach of fiduciary duties undermines and contradicts the recommendation of Fannie Mae's own Conservator that a sale of Fannie Mae's LIHTCs is in the best interest of Fannie Mae in order to conserve and preserve Fannie Mae's assets.

13.     Moreover, hiding behind "taxpayer protection" is not a valid excuse for ignoring shareholder rights.  Indeed, Treasury's conduct in blocking the sale of the tax credits is contrary to the express terms of the Amended and Restated Senior Preferred Stock Purchase Agreement between Treasury and Fannie Mae, described below, by which Treasury acquired a majority of Fannie Mae's shares.

14.     The Stock Purchase Agreement specifically provides that "the purchases contemplated herein are necessary to … protect the taxpayer."   The statute enabling Treasury's investment contains similar language.  Thus, under the express terms of the

Agreement and the statute, "protecting the taxpayer" is limited to the specific context of purchasing stock in Fannie Mae only.  It is not a general license or mandate to control every action or decision of Fannie Mae or its Conservator.  It is not an excuse to protect taxpayers at the expense of Fannie Mae's shareholders or to vitiate Treasury's responsibilities generally to Fannie Mae and Fannie Mae's shareholders.

15.     Accordingly, by this action, Plaintiff seeks declaratory and injunctive relief only, not damages, in the form of an order, *inter alia*, declaring that Treasury, as controlling shareholder of Fannie Mae, has fiduciary duties to Fannie Mae; enjoining Treasury's decision to block the sale of Fannie Mae's tax credits; and/or requiring Treasury to satisfy its fiduciary and other obligations in any further attempts by Fannie Mae to sell, auction or otherwise dispose of Fannie Mae's tax credits.

16.     By proceeding against Treasury, Plaintiff seeks to create the circumstances by which the Conservator can do what it intended to do in satisfaction of its mandate before Treasury, in breach of its fiduciary and statutory duties, thwarted the Conservator's efforts, namely, to sell the tax credits for the benefit of Fannie Mae.

17.     The tax credits still are worth billions of dollars for Fannie Mae.  There still is an active market for the sale and purchase of LIHTCs, and the tax credits still have significant value to investors who remain willing to pay for them.

## JURISDICTION AND VENUE

18.     This Court has jurisdiction over all causes of action asserted herein pursuant to 28 U.S.C. § 1332.  Furthermore, 12 U.S.C. § 1723a(a) provides that Fannie Mae shall have the power "to sue or be sued, and to complain and to defend in any court of competent jurisdiction, State or Federal."

19.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(e) and 28 U.S.C. § 1401.

## PARTIES

20.     Plaintiff Gail Sweeney Estate Marital Trust currently owns, and at all relevant times has owned, securities of nominal defendant Fannie Mae.

21.     Defendant Treasury is a federal department charged with, *inter alia*, managing federal finances, supervising national banks and thrift institutions, and advising on domestic and international financial, monetary, economic, trade and tax policy.  As further alleged herein, Treasury and FHFA have worked in concert to take control of mortgage giant Fannie Mae, an intervention that has resulted in one of the largest federal bailouts or backstops in U.S. history.

22.     Defendant Neal S. Wolin is named herein in his capacity as Acting Treasury Secretary.

23.     Nominal defendant the Federal National Mortgage Association ("Fannie Mae") is a federally chartered, government-sponsored enterprise that supplies capital and liquidity for residential mortgages.  Fannie Mae is a publicly traded private corporation, has a Board of Directors ("Board"), and is required to report to the Securities and Exchange Commission. Fannie Mae's by-laws expressly provide that Delaware General Corporation Law applies to the conduct of Fannie Mae.

24.     Nominal defendant Federal Housing Finance Agency ("FHFA") is the Conservator of Fannie Mae.  In July 2008, in response to the subprime mortgage crisis, Congress enacted the Housing and Economic Recovery Act of 2008 ("HERA"), Pub. L. No. 110-289, 122 Stat. 2654, codified at 12 U.S.C. § 4617.  HERA, among other things, created the

FHFA, which succeeded the Office of Federal Housing Enterprise Oversight as the regulator of

Fannie Mae and the Federal Home Loan Mortgage Corporation ("Freddie Mac").  On

September 6, 2008, pursuant to the authority granted to the FHFA by HERA, then-FHFA

Director James Lockhart appointed the FHFA conservator for Fannie Mae.  As Conservator,

the FHFA acquired the power to take such action as may be "necessary to put [Fannie Mae] in

a sound and solvent condition" and to "preserve and conserve the assets and property" of

Fannie Mae, *id*., §  12 U.S.C. § 4617(b)(2)(D)(i)-(ii), which also is the goal of this action.

25.     Nominal defendant Edward J. DeMarco is named herein in his capacity as

Acting Director of the FHFA.

### NON-DEFENDANT DIRECTORS

26.     William Thomas Forrester ("Forrester") has served as a Fannie Mae Board

member since 2008.

27.     Brenda J. Gaines ("Gaines") initially became a director of Fannie Mae in

September 2006, before the conservatorship, and FHFA re-appointed her to Fannie Mae's

Board in December 2008.

28.     Charlynn Goins ("Goins") has served as a Board member of Fannie Mae since

2008.

29.     Frederick B. "Bart" Harvey III ("Harvey") initially became a director of Fannie

Mae in August 2008, before the conservatorship, and FHFA re-appointed him to Fannie Mae's

Board in December 2008.

30.     Robert H. Herz ("Herz") has served as a Board member of Fannie Mae since

2011.

31.     Philip A. Laskawy ("Laskawy") became a director and Chairman of Fannie

Mae's Board in September 2008.

32.     Timothy J. Mayopoulos ("Mayopoulos") has served as a Board member of Fannie Mae since June 2012.

33.     Egbert L. J. Perry ("Perry") has served as a Board member of Fannie Mae since December 2008.

34.     Jonathan Plutzik ("Plutzik") has served as a Board member of Fannie Mae since November 2009.

35.     David H. Sidwell ("Sidwell") has served as a Fannie Mae Board member since December 2008.

36.     The directors of Fannie Mae are not named as defendants because, as set forth below, the Conservator effectively has assumed all of the powers of the directors.  The directors, therefore, are not indispensable parties to this action.

## TREASURY AS CONTROLLING SHAREHOLDER

37.     At all relevant times as alleged herein, Treasury was the controlling shareholder of Fannie Mae and possessed, directly or indirectly, the power to direct or cause, and actually did direct and cause, the direction of the management or polices of Fannie Mae and/or the Conservator, whether through the ownership of voting securities, by contract or otherwise.

38.     Treasury is a controlling shareholder of Fannie Mae by virtue of its actual control over the transaction at issue in this case.  As further alleged herein, Treasury had the ability to and, in fact, exercised actual control over Fannie Mae's affairs in that it actually prevented the Conservator from selling Fannie Mae's tax credits.  For the purpose of establishing control, it is not necessary for the Treasury to oversee the day-to-day operations of Fannie Mae or the Conservator; control over the particular transaction at issue in this case also

is enough to impose fiduciary duties for purposes of that transaction.

39.     In addition, Treasury holds a voting interest in Fannie Mae's stock and exerts actual control over the corporate decision-making and regulatory affairs of Fannie Mae.

40.     On September 7, 2008, Fannie Mae, through FHFA, in its capacity as Conservator, and Treasury entered into the Senior Preferred Stock Purchase Agreement ("Stock Purchase Agreement").  Pursuant to the agreement, Fannie Mae issued to Treasury one million shares of senior preferred stock with an initial aggregate liquidation preference of $1 billion and a warrant for the purchase of up to 79.9% of the total number of shares of common stock outstanding on a fully diluted basis on the date of exercise, exercisable until September 7, 2028.  Fannie Mae's 2011 10-K further confirms that Treasury still is the only holder of more than 5% of Fannie Mae's stock and that Treasury beneficially owns 79.9% of Fannie Mae's common stock.

41.     Treasury also exerts actual control over the corporate decision-making and regulatory affairs of Fannie Mae.  For example, the Stock Purchase Agreement expressly provides that Fannie Mae cannot, without the Treasury's consent: (1) make any payment to purchase or redeem its capital stock, or pay any dividends, including preferred dividends; (2) issue capital stock of any kind; (3) enter into any new or adjust any existing compensation agreements with named executive officers; (4) sell, convey, or transfer any of its assets outside the ordinary course of business except as necessary to meet their obligation under the agreements to reduce in their portfolio of retained mortgages and mortgage back securities; (5) increase its debt to more than 110% of its debt as of June 30, 2008; or (6) acquire or consolidate with, or merge into, another entity.  Under the terms of the Stock Purchase Agreement, Fannie Mae also cannot terminate the Conservatorship.

42.     Based on the foregoing, Treasury is a controlling shareholder under Delaware law.

43.     As a controlling shareholder of Fannie Mae, Treasury owes fiduciary duties of, *inter alia*, loyalty and good faith to Fannie Mae's minority shareholders.

44.     In accordance with its duties as a controlling shareholder, Treasury is obligated to refrain from unjustly enriching itself at the expense or to the detriment of the Company's minority shareholders; to refrain from abusing its position of control; to not favor its own interests at the expense of the Company's minority security holders; to act in furtherance of the best interests of Fannie Mae so as to benefit all shareholders and not in furtherance of its own interests or benefit; to ensure that no conflicts of interest exist between its own interests and its fiduciary obligations to other shareholders or, if such conflicts exist, to ensure that such conflicts are resolved in the best interests of Fannie Mae and its minority shareholders; and to ensure that the Conservator has the opportunity to consider potential transactions in the Company's best interests.

45.     In acting as alleged herein, Treasury has breached its fiduciary duties. Treasury knowingly, purposefully, deliberately, willfully, culpably, recklessly, negligently or with gross negligence, breached its fiduciary duties to the Company's minority shareholders by committing, causing or permitting to be committed the acts complained of herein.

46.     Treasury's duties as a controlling shareholder have never been vitiated or excused.

47.     On information and belief, there is nothing in the statutes regulating the FHFA, the FHFA's charter or elsewhere that relieves Treasury of its fiduciary duties as controlling shareholder under corporate law or that permits Treasury to breach its fiduciary duties as a

controlling shareholder, or that allows Treasury, as a controlling shareholder of Fannie Mae, to

act in a way that causes the deterioration of Fannie Mae's assets.  Fannie Mae still is a publicly

traded company.  There are not different rules for a controlling shareholder when the

controlling shareholder is Treasury.

48.     Treasury's conduct is particularly egregious in that its breach of fiduciary duties

undermines, contradicts and runs contrary to the recommendation of Fannie Mae's own

Conservator that a sale of Fannie Mae's tax credits is in the best interest of Fannie Mae in

order to conserve and preserve Fannie Mae's assets, as further alleged herein.

49.     Moreover, blocking the sale of the tax credits to "protect taxpayers" is not a

valid excuse to trample shareholder rights and is contrary to Treasury's duties under the Senior

Preferred Stock Purchase Agreement.

50.     Under the Stock Purchase Agreement, Treasury agreed to purchase stock in

Fannie Mae to: "(i) provide stability to the financial markets; (ii) prevent disruption in the

availability of mortgage finance; and (iii) *protect the taxpayer*. . ."  (Emphasis added).

51.     Similarly, the Federal National Mortgage Association Charter Act, as amended,

provides for the Treasury to purchase securities of Fannie Mae to "(i) provide stability to the

financial markets; (ii) prevent disruption in the availability of mortgage finance; and (iii)

protect the taxpayer. . ." and further provides that:

> *To protect the taxpayers*, the Secretary of the Treasury shall take
> into consideration the following in connection with exercising the
> authority contained in this paragraph:
>
> **(i)** The need for preferences or priorities regarding payments to
> the Government.
> **(ii)** Limits on maturity or disposition of obligations or securities
> to be purchased.
> **(iii)** The corporation's plan for the orderly resumption of private
> market funding or capital market access.

(iv) The probability of the corporation fulfilling the terms of any
such obligation or other security, including repayment.
(v) The need to maintain the corporation's status as a private
shareholder-owned company.

12 U.S.C. § 1719.  (Emphasis added).

52.     Treasury's mandate to protect "the taxpayer" as described, however, is limited
to the specific context of protecting taxpayers by purchasing stock in Fannie Mae.  It is not a
general license, pretext or excuse to protect taxpayers at the expense of Fannie Mae's
shareholders or to vitiate Treasury's responsibilities generally to Fannie Mae and Fannie Mae's
shareholders.

## FANNIE MAE'S TAX CREDITS

53.     The low income housing tax credit program was created in 1986 and is the most
important resource for creating affordable housing in the United States, providing tax credits
for the acquisition, rehabilitation or new construction of rental housing targeted to low income
households.  The LIHTC program is able to deliver apartments at rents affordable to low
income households by selling tax credits to investors and using the net proceeds of the tax
credit sales to reduce the debt the property must support.  Tax credits are more attractive to
investors than tax deductions because they provide dollar for dollar reductions in a taxpayer's
federal income tax, whereas a tax deduction only provides a reduction in taxable income.

54.     The LIHTC program provides funding for the development costs of low-income
housing by allowing investors (usually the partners of a partnership that owns the housing) to
take a federal tax credit equal to a percentage of the cost incurred for development of the low-
income units in a rental housing project.  In exchange for cash to finance construction, a
developer syndicates the credit to investors.  The investors make capital contributions to the
partnership or limited liability company that owns the project in exchange for being allocated

the entity's LIHTCs over a ten-year period.  Developers typically sell the credits by entering

into limited partnerships (or limited liability companies) with an investor, with 99.99% of the

profits, losses, depreciation, and tax credits being allocated to the investor as a partner in the

partnership.  The developer serves as the general partner/managing member, and receives a

majority of the cash flow (either through the payment of fees or through distributions).

55.      As of at least November 2009, Fannie Mae had accumulated over $5.2 billion in

tax credits for investing in low income housing.  However, Fannie Mae could not recognize the

tax benefits associated with the tax credits because Fannie Mae was not profitable and it did

not have profits against which the tax credits could be offset.  Moreover, the tax credits were

continuing to lose value as the economic crisis worsened, adding to the losses that Fannie Mae

was reporting each quarter.

56.      Sometime prior to September 30, 2009, Fannie Mae entered into a non-binding

letter of intent to transfer approximately $3 billion of equity interests in its low income housing

tax credits to third-party investors for a price exceeding their then-current value.  The FHFA,

as Conservator of Fannie Mae, approved of the transaction as consistent with the FHFA's

mandate to conserve the assets of Fannie Mae.  Pursuant to the terms of Fannie Mae's senior

preferred stock purchase agreement with the United States Department of Treasury, the FHFA

then requested approval from Treasury to sell the tax credits.

57.      On or about November 2, 2009, it was reported that Goldman Sachs had offered

to pay cash for a portion of Fannie Mae's LIHTCs. The deal was touted as a win-win, as

Fannie Mae would get cash infusions, and Goldman Sachs, and perhaps a syndicate of other

investors, would be able to reduce their tax payments.

58.      On or about November 5, 2009, it was reported that Warren Buffet's Berkshire

Hathaway, Inc. had joined Goldman Sachs' bid to buy the tax credits.

59.     On or about November 5, 2009, Fannie Mae reported in its 10-Q filed with the SEC that Fannie Mae had reached an agreement to sell one-half (about $2.6 billion) of its low income housing tax credits to unidentified buyers or third-party investors (believed to be Goldman Sachs and Berkshire Hathaway).  The sale was supported by the FHFA which issued a public statement supporting the transfer of tax credits as consistent with the FHFA's responsibility to conserve the assets of Fannie Mae.  The tax credit sale, however, was contingent on Treasury's approval, pursuant to the Stock Purchase Agreement.

60.     Fannie Mae's 10-Q filed on November 5, 2009 stated, in relevant part:

> As of September 30, 2009 and December 31, 2008, we had LIHTC partnership investments, excluding restricted cash from consolidations, of $5.2 billion tax position, we did not make any LIHTC investments in the first nine months of 2009 other than pursuant to commitments existing prior to 2008, and we are not currently recognizing a majority of the tax benefits associated with tax credits and net operating losses in our condensed consolidated financial statements.  We recorded $380 million and $322 million for the three months ended September 30, 2009 and 2008, respectively, and $829 million and $369 million for the nine months ended September 30, 2009 and 2008, respectively, of impairment related to our limited partnerships in "Losses from partnership investments" in our condensed consolidated statements of operations.

61.     The 10-Q further noted that:

> Prior to September 30, 2009, we entered into a nonbinding letter of intent to transfer equity interests in our LIHTC investments. Under the terms of the transaction as currently contemplated, we would transfer to unrelated third-party investors approximately one-half of our LIHTC investments for a price that exceeds their current carrying value.  Upon completion of the contemplated transfer, the unrelated third-party investors would be entitled to receive substantially all of the tax benefits from our LIHTC investments for a specified period of time.  At a specified future date, the percentage of tax benefits the investors would receive would automatically be reduced and the percentage of tax

benefits we would receive would be increased by the same amount. In addition, we could have the obligation to reacquire all or a portion of the transferred interests.

We have requested the approval of FHFA, as our conservator, to complete this transaction. FHFA has advised us that it has no objection to this transaction as it is consistent with the conservation of the assets of the corporation and has requested Treasury's approval under the senior preferred stock purchase agreement. As of November5, 2009, FHFA has not yet received this approval. If in the future we determine we no longer have the intent and ability to sell or otherwise transfer our LIHTC investments for value, we would record additional other-than-temporary impairment to reduce the carrying value of our LIHTC investments to zero. As of September 30, 2009, the carrying value of our LIHTC investments was $5.2 billion.

62.    On November 5, 2009, the FHFA issued its own public statement entitled

"Statement of FHFA Acting Director Edward J. DeMarco Concerning the Possible Transfer of

Fannie Mae Low-Income Housing Tax Credits to Investors," in which the Conservator

confirmed that disposing of the tax credits was in the best interests of Fannie Mae and

consistent with the Conservator's mandate to conserve and preserve Fannie Mae's assets:

Shortly after the establishment of the conservatorships for Fannie Mae and Freddie Mac, FHFA issued a statement emphasizing the importance of all aspects of the Enterprises' multifamily businesses to a healthy secondary market and housing affordability -- including the low-income housing tax credit (LIHTC) program. FHFA indicated it did not intend the establishment of the conservatorships to result in a liquidation of the Enterprises' LIHTC or mortgage-revenue bond portfolios. Since then, in the interest of providing support to the LIHTC market and conserving the assets of the corporations, FHFA has authorized each company to seek utilizations of their LIHTC portfolios provided they met those goals -- to be supportive of the market's valuation of such assets and to recognize value for the conservatorships. *To that end, FHFA has informed Fannie Mae that a possible transfer of a portion of its LIHTC investments to unrelated third-party investors is consistent with FHFA's ongoing efforts to conserve Enterprise assets and with the Enterprise's multifamily housing mission.* As Fannie Mae indicated in an SEC filing today, that transaction is under review

at the Treasury Department consistent with the terms of the Senior Preferred Stock Purchase Agreements. Treasury's review may encompass tax, fiscal, or other considerations beyond FHFA's purview. FHFA remains committed to seeking ways for the Enterprises to add liquidity and support to this important segment of the multifamily housing market while conserving the assets of the companies.

(Emphasis added.)

63.     Indeed, the sale of the tax credits would have reduced the amounts that Fannie Mae had to borrow from the government, would have helped to stabilize Fannie Mae, would have helped Fannie Mae pay back the monies it received from the financial bailout and/or would have allowed Fannie Mae to pump needed monies into more low income housing. Further, the sale of the tax credits is consistent with the public interest in that it would bolster the secondary market for LIHTC assets, which would substantially increase the universe of LIHTC investors and thereby increase the supply of new affordable housing.

64.     However, notwithstanding its duties to Fannie Mae shareholders, on November 6, 2009, Treasury refused to consent to the sale of the tax credits. Treasury stated that, in its view, the proposed sale would result in a loss of aggregate tax revenues that would be greater than the savings to the federal government from a reduction in the capital contribution obligation of Treasury to Fannie Mae under the Stock Purchase Agreement and that withholding approval of the sale affords more protection to taxpayers than providing approval of the tax credit sale.

65.     As Fannie Mae reported in its SEC filing on November 9, 2009:

As we disclosed in our quarterly report on Form 10-Q for the period ended September 30, 2009, we requested the approval of the Federal Housing Finance Agency ("FHFA"), as our conservator, to complete this transaction. FHFA advised us that it had no objection to this transaction as it was consistent with the conservation of the assets of the corporation and that FHFA had

requested approval from the U.S. Department of Treasury ("Treasury") of the transaction under the terms of our senior preferred stock purchase agreement with Treasury.  As of the date of filing of our third quarter Form 10-Q, we had not received any response from Treasury.

On November 6, 2009, Treasury notified FHFA and us by letter that it is not consenting to the proposed transaction.  In its letter, Treasury stated that it weighed several considerations in deciding whether to provide or withhold approval of the proposed transaction and that, in its view, the proposed sale would result in a loss of aggregate tax revenues that would be greater than the savings to the federal government from a reduction in the capital contribution obligation of Treasury to Fannie Mae under the senior preferred stock purchase agreement.  Treasury further stated that withholding approval of the proposed sale affords more protection of the taxpayers than does providing approval.

We are evaluating whether Treasury's decision changes our prior determination that we continue to have the intent and ability to sell or otherwise transfer our LIHTC investments for value. While our conservator has directed us to continue to explore options to sell or transfer these investments for value consistent with our mission, we believe this will be difficult given current constraints and market conditions.  While we have not made any decision with respect to whether an impairment of these assets is required under generally accepted accounting principles, if we are unsuccessful in selling or otherwise transferring these investments for value, we are likely to record additional other-than-temporary impairment in the fourth quarter of 2009 that could reduce the carrying value of our LIHTC investments to zero.

As of September 30, 2009, the carrying value of our LIHTC investments was $5.2 billion.  If we record an impairment, our net worth will be reduced by an amount equal to the impairment. Because we expect to have a net worth deficit in future periods, the impairment will increase the amount that would be requested from Treasury by FHFA on our behalf under the senior preferred stock purchase agreement.

66.     As stated by the Company in its 10-Q filed on November 5, 2009, and in the

foregoing statement, Defendants' continued failure to consent to the sale of the tax credits

threatened to result in (1) the permanent impairment of the Company's tax credit assets, (2) the

reduction of the carrying value of those tax credit assets to zero and (3) a corresponding reduction in the Company's net worth.  Defendants' actions risked wiping out an asset of the Company worth billions of dollars.

67.     Treasury's refusal to consent to the sale of the tax credits was motivated by political considerations and caused Fannie Mae to pursue political or policy goals, rather than maximizing Fannie Mae's value for the benefit of all its shareholders.  The banking and securities businesses of the "third-party investors," specifically, Goldman Sachs, had been criticized as profiting from the sale of subprime mortgage-backed securities while the nation's housing markets crumbled, triggering a devastating recession.  Therefore, the prospect of Goldman Sachs benefitting from Fannie Mae's tax credits was politically unpalatable.

68.     For example, on November 9, 2009, an article published on www.bloomberg.com quoted Paul Miller, a bank analyst with FBR Capital Markets, as stating that "[E]very politician on Capitol Hill right now hates Goldman," and further stating with reference to the potential sale of Fannie Mae's tax credit to Goldman Sachs that "[P]olitically, this would look really bad."

69.     Similarly, an article in the *New York Times* on or about November 9, 2009 reported that:

> Treasury officials confirmed on Monday that Goldman Sachs, which reported record quarterly profits last month, has proposed buying or at least borrowing tens of millions of dollars worth of unused tax credits from Fannie Mae, the mortgage finance company that is now owned by the government ….

> But the political appearances could hardly be worse. Lawmakers in both parties have fumed time and again that Wall Street firms—Goldman Sachs in particular—seemed to be profiting from the mortgage bubble and bust they played a central role in financing ….

70.     Following the November 9, 2009 announcement by Treasury, Fannie Mae

continued to request that Treasury approve the sale of the tax credits, and Treasury continued

to block the sale.

71.     On February 24, 2010, Fannie Mae filed a Form 8-K/A amending the original 8-

K filed on November 6, 2009.  The 8-K/A confirms Fannie Mae's continued efforts and

Treasury's continued refusal:

>       On November 6, 2009, Treasury notified FHFA and us that it did
>       not consent to the proposed transaction.  Treasury stated that the
>       proposed sale would result in a loss of aggregate tax revenues
>       that would be greater than the savings to the federal government
>       from a reduction in the capital contribution obligation of Treasury
>       to Fannie Mae under the senior preferred stock purchase
>       agreement.  Treasury further stated that withholding approval of
>       the proposed sale afforded more protection to the taxpayers than
>       approval would have provided.  We have continued to explore
>       option to sell or otherwise transfer our LIHTC investments for
>       value consistent with our mission; however, to date, we have not
>       been successful.
>
>       On February 18, 2010, the FHFA informed us by letter, after
>       further consultation with the Treasury, that we may not sell or
>       transfer our LIHTC partnership interests and that FHFA sees no
>       disposition options.

72.     As a result of Treasury's decision, Fannie Mae was forced to write down the

value of the LIHTCs to zero.  As the 8-K/A further states:

>       Therefore, in connection with the preparation, review and audit of
>       our financial statement for the year ended December 31, 2009, we
>       have concluded that we no longer have both the intent and ability
>       to sell or otherwise transfer out LIHTC investments for value.  As
>       a result, we have recognized a loss of $5.0 billion during the fourth
>       quarter of 2009 to reduce the carrying value of our LIHTC
>       partnership investments to zero in the consolidated financial
>       statements, and our net worth will be reduced by an equal amount.
>       Accordingly, this loss will increase the amount that will be
>       requested from the Treasury by FHFA on our behalf under the
>       senior preferred stock purchase agreement.

73.     However, the tax credits, still are worth billions of dollars and have significant value to investors who remain willing to pay for them.  There is still an active market for the sale and purchase of LIHTCs, and Fannie Mae remains unable to utilize all of the tax credits associated with the LIHTC investments.

74.     In acting as alleged herein, Treasury breached and is continuing to breach its fiduciary duties to Fannie Mae's minority shareholders.  As the controlling shareholder of Fannie Mae, Treasury has a continuing duty to act in the best interest of Fannie Mae.

75.     The Treasury engaged, and continues to engage, in self-dealing and has breached, and is continuing to breach, its duty of loyalty by compelling Fannie Mae to pursue Treasury's policy goals rather than acting to maximize value for Fannie Mae and by choosing to protect its own interests at the expense of Fannie Mae.  In intentionally acting with a purpose other than advancing the best interests of Fannie Mae, Treasury acted, and continues to act, in bad faith. Moreover, by refusing to consent to the sale of Fannie Mae's LIHTCs, Treasury is wasting and not conserving or preserving the assets of Fannie Mae in dereliction of its fiduciary duties.

76.     As a result of Treasury's conduct, Fannie Mae has been damaged.

77.     Similar to Fannie Mae, the Federal Home Loan Financial Corporation ("Freddie Mac") also requires Treasury's consent to sell any of its LIHTC investments.  On or about February 24, 2010, Freddie Mac stated that "after consultation with Treasury and consistent with the terms of our Purchase Agreement, the Federal Housing Finance Agency (FHFA) informed Freddie Mac the company may not sell or transfer the [LIHTC] assets," then valued at approximately $3.4 billion.  It is the intent of the instant action to create the circumstances whereby not only Fannie Mae, but also Freddie Mac will be able to sell its tax credits.

## DEMAND EXCUSED ALLEGATIONS

78.     Demand on Fannie Mae's Board to institute this litigation would be futile and is excused.

79.     Because the Conservator has assumed all of the powers of the Board, there are no independent directors who could consider a pre-suit demand.

80.     As reported in the Company's public filings, on September 6, 2008, at the request of the Secretary of the Treasury, the Chairman of the Board of Governors of the Federal Reserve and the Director of FHFA, Fannie Mae's Board adopted a resolution consenting to the Company's placement into conservatorship.  The Director of FHFA then appointed FHFA as Fannie Mae's Conservator on September 6, 2008, in accordance with the Regulatory Reform Act and the Federal Housing Enterprises Financial Safety and Soundness Act.

81.     As confirmed by the Company's public filings, upon its appointment, the Conservator "immediately succeeded to all rights, titles, powers and privileges of Fannie Mae, and of any stockholder, officer or director of Fannie Mae with respect to Fannie Mae and its assets, and succeeded to the title to all books, records and assets held by any other legal custodian or third party [of Fannie Mae].  The conservator has the power to take over [Fannie Mae's] assets and to operate [Fannie Mae's] business . . . and to conduct all business of the company."  FHFA, in its role as Conservator, has overall management authority over Fannie Mae's business.

82.     FHFA Director Lockhart expressly stated on September 7, 2008, in announcing the appointment of FHFA as conservator of Fannie Mae, that "FHFA will assume the power of the Board and management."  Accordingly, Fannie Mae's Board no longer has the power or

duty to manage, direct, or oversee the business and affairs of the Company, including whether to initiate a lawsuit for breach of fiduciary duties by its controlling shareholder.

83.     Further, Fannie Mae's directors, and each of them individually, lack sufficient independence because all of the directors of Fannie Mae were appointed by, and thereby are beholden to and controlled by, the Conservator.  As the Company reported in its Form 8-K filing with the SEC on December 24, 2008, FHFA, as Conservator, "reconstituted" Fannie Mae's Board by handpicking and appointing Fannie Mae's directors.  The FHFA also directs Fannie Mae regarding the function and authorities of the Board.

84.     Fannie Mae's Code of Conduct and Conflicts of Interest Policy for Members of the Board further confirms that Fannie Mae's directors are entirely beholden to the Conservator and lack the independence necessary to consider a pre-suit demand.  Fannie Mae's Code of Conduct states, in relevant part:

> For as long as the Corporation remains under the conservatorship, the directors of the Corporation shall serve on behalf of the Conservator and shall be required to exercise authority as directed by and with the approval, where required, of the Conservator and shall have no duties to any person or entity except to the Conservator. Accordingly, the directors are not obligated to consider the interests of the Corporation, the holders of the Corporation's equity or debt securities or the holders of the Corporation's mortgage-backed securities, unless specifically directed to do so by the Conservator.

85.     Similarly, the Company's 2011 10-K further confirms that the directors are beholden to the Conservator.  The 10-K states, in relevant part, "Our initial directors were appointed by the conservator and subsequent vacancies have been and may continue to be filled by the Board, subject to review by the conservator" and that "[d]uring the conservatorship, FHFA, as conservator, has all powers of the shareholders and Board of Directors of Fannie Mae.  As a result, under the GSE Act, Fannie Mae's common shareholders

no longer have the ability to recommend director nominees or elect the directors of Fannie Mae . . . ."

86.   The 10-K further states:

Our directors serve on behalf of the conservator and exercise authority as directed by and with the approval, where required, of the conservator.  Our directors do not have any duties to any person or entity except to the conservator.  Accordingly, our directors are not obligated to consider the interests of the company, the holders of our equity or debt securities or holders of Fannie Mae MBS unless specifically directed to do so by the conservator.

87.   Further, the 10-K states that the Conservator has "directed the Board to consult with and obtain the approval of the conservator" before taking action in specific areas, including actions involving capital stock, dividends, the Stock Purchase Agreement, increases in risk limits, material changes in accounting policy and reasonably foreseeable material increases in operational risk; matters that relate to conservatorship; and any action that in the reasonable business judgment of the Board at the time that the action is taken is likely to cause significant reputational risk.

88.   Fannie Mae's by-laws similarly state, in relevant part:

The Director of the Federal Housing Finance Agency, or FHFA, Fannie Mae's safety, soundness and mission regulator, appointed FHFA as conservator of Fannie Mae on September 6, 2008.  As conservator, FHFA succeeded to all rights, titles, powers and privileges of the corporation, and of any stockholder, officer or director of the corporation with respect to the corporation and its assets, and may, by regulation or order, provide for the exercise of any function by any stockholder, director, or officer of Fannie Mae.   On November 24, 2008, FHFA, as conservator, reconstituted the Fannie Mae Board of Directors (Board) and directed the functions and authorities of the Board.  The Board serves on behalf of the conservator and shall exercise their authority as directed by the conservator.

89.   Based on the foregoing, as a practical matter, demand on the Fannie Board of

Directors would be futile and is excused.

90.     To the extent that demand would, or should, be made on the Conservator itself, such demand also would be futile because the Conservator has manifest, disabling and irreconcilable conflicts of interest with respect to this action and lacks the independence necessary to consider a pre-suit demand, as set forth below.

## NO JURISDICTIONAL BAR

### Plaintiff Has Standing to Sue

91.     Plaintiff, not the FHFA as Conservator, has standing to represent Fannie Mae in this case under the "manifest conflict of interest" exception to 12 USC § 4716(b) because the FHFA has manifest, disabling and irreconcilable conflicts which preclude it from prosecuting this action.  As further alleged below, it would be impractical, if not absurd, for the FHFA to sue itself and/or for the FHFA to sue Treasury given the nature and extent of the relationship between the FHFA and Treasury.  Under the circumstances of this case, Plaintiff, not the FHFA, is in the best position to prosecute this action.

92.     HERA does not endow the FHFA with sole authority to litigate claims belonging to Fannie Mae, under the unique circumstances of this case.

93.     First, it would be impractical, if not absurd, for the FHFA (and for that matter, Fannie Mae's Board) to sue Treasury.  Treasury is a closely-related sister federal agency that has acted in concert with the FHFA and Fannie Mae specifically to restore confidence in Fannie Mae.

94.     Among other things, as announced on September 7, 2008 and as further alleged below, the FHFA and Treasury together placed Fannie Mae in conservatorship; established a preferred stock purchase agreement between Treasury and Fannie Mae; and established a new

secured lending credit facility that is available to Fannie Mae.  Treasury also initiated a new program to purchase the mortgage backed securities of Fannie Mae.

95.     Further, the FHFA and Treasury continue to play complementary roles in bailing out Fannie Mae.  In addition to being Fannie Mae's largest shareholder, Treasury is Fannie Mae's primary, if not sole, source of capital and financial assistance, having infused billions of dollars into Fannie Mae which has been managed by FHFA as conservator.

96.     As Fannie Mae's 2011 10-K states:

> We issued the warrant and the senior preferred stock as an initial commitment fee in consideration of Treasury's commitment to provide up to $100 billion in funds to us under the terms and conditions set forth in the senior preferred stock purchase agreement. On May 6, 2009, Treasury amended the senior preferred stock purchase agreement to increase its funding commitment to $200 billion and to revise some of the covenants in the agreement. Treasury further amended the senior preferred stock purchase agreement on December 24, 2009 in order to further increase its funding commitment as necessary to accommodate any net worth deficiencies attributable to periods during 2010, 2011 and 2012. If we do not have a positive net worth as of December 31, 2012, then the amount of funding available under the senior preferred stock purchase agreement after 2012 will be $124.8 billion ($200 billion less $75.2 billion in cumulative draws for net worth deficiencies through December 31, 2009). In the event we have a positive net worth as of December 31, 2012, then the amount of funding available after 2012 under the senior preferred stock purchase agreement will depend on the size of that positive net worth relative to the cumulative draws for net worth deficiencies attributable to periods during 2010, 2011 and 2012, as follows: (a) if our positive net worth as of December 31, 2012 is less than the cumulative draws for net worth deficiencies attributable to periods during 2010, 2011 and 2012, then the amount of available funding will be $124.8 billion less our positive net worth as of December 31, 2012; or (b) if our positive net worth as of December 31, 2012 is greater than the cumulative draws for net worth deficiencies attributable to periods during 2010, 2011 and 2012, then the amount of available funding will be $124.8 billion less the cumulative draws attributable to periods during 2010, 2011 and 2012. The amendment also made some other revisions

> to the agreement ….   We have received an aggregate of $111.6 billion from Treasury under the senior preferred stock purchase agreement, and the Acting Director of FHFA will submit a request to Treasury on our behalf for an additional $4.6 billion from Treasury under the senior preferred purchase stock agreement.

97.     Moreover, the FHFA and Treasury legally are "related parties," as Fannie Mae's 10-Q for the period ending September 30, 2012, confirms: "As a result of our issuance to Treasury of the warrant to purchase shares of Fannie Mae common stock equal to 79.9% of the total number of shares of Fannie Mae common stock, we and Treasury are deemed related parties."

98.     Fannie Mae's 2011 10-K confirms the extent of the related party transactions:

> We have received an aggregate of $111.6 billion from Treasury under the senior preferred stock purchase agreement, and the Acting Director of FHFA will submit a request to Treasury on our behalf for an additional $4.6 billion from Treasury under the senior preferred purchase stock agreement.     Through December 31, 2011, we have paid an aggregate of $19.8 billion to Treasury in dividends on the senior preferred stock.

99.     Moreover, in 2009, the Obama Administration announced its Homeowner Affordability and Stability Plan.  Pursuant to this plan, in March 2009, the Administration announced the details of its Making Home Affordable Program, a program intended to provide assistance to homeowners and prevent foreclosures.  One of the primary initiatives under the Making Home Affordable Program is the Home Affordable Modification Program, or HAMP, which is aimed at helping borrowers, whose loans are either currently delinquent or at imminent risk of default, by modifying their mortgage loan to make their monthly payments more affordable.

100.     In addition to Fannie Mae's participation in the Administration's initiatives under the Making Home Affordable Program, Treasury engaged Fannie Mae to serve as

program administrator for loans modified under HAMP pursuant to the financial agency agreement between Treasury and Fannie Mae dated February 18, 2009.  Under Fannie Mae's arrangement with Treasury, Treasury has agreed to compensate Fannie Mae for a significant portion of the work that Fannie Mae has performed in its role as program administrator for HAMP and other initiatives under the Making Home Affordable Program.  Pursuant to the budget established by Treasury, Fannie Mae expects to receive an aggregate of approximately $252 million from Treasury for its work as program administrator for U.S. government fiscal years 2009 through 2012, and expects to receive from Treasury an additional amount of approximately $56 million to be passed through to third-party vendors engaged by Fannie Mae for HAMP and other initiatives under the Making Home Affordable Program.

101.    In sum, given the nature and extent of the relationship between FHFA and Treasury, neither the FHFA nor Fannie Mae's directors could be expected to objectively pursue a lawsuit against Treasury, even when it would be in the best interest of the FHFA to do so.

102.    Moreover, the FHFA suffers from a further disabling conflict of interest in that the wrong alleged herein was caused, in part, *by the FHFA itself*.  While the FHFA originally endorsed the sale of Fannie Mae's tax credits because the FHFA recognized that such a sale was consistent with its mandate to preserve Fannie Mae's assets, FHFA was bound by Treasury's decision and abandoned its mandate when Treasury refused to approve the sale.

103.    In addition, both the directors of the Fannie Mae Board and the Conservator effectively are controlled by Treasury as controlling shareholder.  As evidenced by the conduct alleged herein, both the Board and the Conservator, in fact, have deferred to the controlling shareholder with respect to the disposition of Fannie Mae's tax credits.  Neither the

Conservator nor the Board has commenced any action against Treasury despite the passage of time, nor taken any action whatsoever to remedy the damage caused to Fannie Mae.

104.     Based on the foregoing, a common sense conflict of interest exception to 12 USC § 4617(b) warrants granting standing to Plaintiff as a representative of Fannie Mae in this case.  It is patently unrealistic to expect the Conservator to be able to evaluate the alleged claims impartially.  Under the circumstances as alleged herein, the FHFA cannot, and should not, have the final say as to whether it is in Fannie Mae's best interest to sue Treasury.

## 12 USC § 4617(f) DOES NOT BAR THIS ACTION

105.     12 USC § 4617(f), which states that "no court may take any action to restrain or affect the powers or functions of [the FHFA] as conservator," or similar statutes, do not bar jurisdiction over Plaintiff's claims.

106.     The purpose of § 4617(f) is to prevent independent derivative actions that would affect the FHFA's duties as Conservator by *interfering* with its abilities to manage Fannie Mae's assets.  The purpose of this lawsuit is just the opposite: to create the circumstances by which the Conservator *can do precisely what it intended to do* before Treasury, in breach of its fiduciary duties, thwarted the Conservator's efforts, namely, sell the tax credits for the benefit of Fannie Mae.  This goal is consonant with, not in opposition to, § 4617(f).

107.     Under the circumstances as alleged herein, the FHFA cannot credibly claim that it has no obligation to enhance the value of Fannie Mae, as the Conservator already has sought to do precisely what Plaintiff seeks to accomplish through this action – namely, effectuate a sale of Fannie Mae's tax credits for the benefit of Fannie Mae.

108.     Further, the anti-injunction provisions of § 4617(f) or similar provisions are not a bar when the Conservator acts beyond or contrary to its statutory powers or functions in a

manner that adversely impacts the rights of others.  In acting as alleged herein, the Conservator has acted contrary to its statutory powers by not conserving and preserving the assets of Fannie Mae as a result of Treasury's breach of fiduciary duties.

109.    Moreover, Plaintiff does not seek to enjoin, restrain or affect any powers of the FHFA as Conservator.  Plaintiff's action is directed at Treasury as controlling shareholder, not the FHFA.

110.    Similarly, on information and belief, there is nothing in the Emergency Economic Stabilization Act of 2008 ("EESA"), 12 U.S.C. § 5201, *et seq.*, HERA or any other statute or regulation enabling the Conservatorship that precludes this derivative action against Treasury as a controlling shareholder.  Indeed, FHFA's liability waivers under EESA apply only to government decisions on *how to spend TARP funds* and do not cover acts of pressuring recipients to institute policy changes as a result of the government's share ownership.

## NO SOVEREIGN IMMUNITY

111.    Plaintiff's claims against Treasury are exempt from sovereign immunity under, *inter alia*, §§ 702 and 706 of the Administrative Procedure Act ("APA"), 5 U.S.C. § 700, *et seq.*

112.    5 U.S.C. § 702 provides, in relevant part that:

> A person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof.  An action in a court of the United States seeking relief other than money damages and stating a claim that an agency or an officer or employee thereof acted or failed to act in an official capacity or under color of legal authority shall not be dismissed nor relief therein be denied on the ground that it is against the United States or that the United States is an indispensable party.

113.    Fannie Mae has been "adversely affected or aggrieved" by Treasury's action as

alleged herein within the meaning of Delaware's corporate law and statutes.  Pursuant to § 702, Plaintiff seeks injunctive relief only, not damages.

114.    Further, 5 U.S.C. § 706 provides, in part, that:

> To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall--
>
> (1) compel agency action unlawfully withheld or unreasonably delayed; and
>
> (2) hold unlawful and set aside agency action, findings, and conclusions found to be--
>
> (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law ....

115.    Pursuant to § 706, this Court may compel Treasury to take action unlawfully withheld or unreasonably delayed as alleged herein, and hold unlawful and set aside Treasury action, findings, and conclusions found to be otherwise "not in accordance with law," namely Delaware law regarding the fiduciary responsibilities of controlling shareholders.  Treasury is bound by the same state law limits as any other controlling shareholder under Delaware law. As Treasury's actions are inconsistent with Delaware law, they are "not in accordance with law" and thus invalid under § 706.

116.    5 U.S.C. § 701(a)(2), which provides that the exclusion from sovereign immunity under the APA does not apply to "agency action committed to agency discretion by law," does not preclude application of the APA to Plaintiff's claims.  There is no law that provides Treasury with the discretion to act as alleged herein in abrogation of its fiduciary duties as a controlling shareholder.  To the contrary, Delaware law applies, and mandates meaningful legal standards for controlling shareholders, which Treasury continues to violate,

as alleged herein.

117.    Further, Treasury's action at issue is not a normal exercise of agency authority. Here, Treasury is acting in the private sector as a controlling shareholder and beyond the scope of agency discretion.

118.    Moreover, as set forth above, the "agency action committed to agency discretion by law" in this case is limited to Treasury's decisions as to how to spend TARP funds, not Treasury's power to control recipients' policy decisions.  Congress did not commit to agency discretion the management of conflicts of interest created by Treasury's controlling shareholder position.

## FIRST CAUSE OF ACTION

### (Breach of Fiduciary Duties)

119.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

120.    Each of the Defendants owed Fannie Mae and its securities holders the fiduciary duties of, *inter alia*, loyalty and good faith.

121.    As demonstrated by the allegations above, Defendants breached their fiduciary duties, have engaged in unlawful self-dealing and have acted to put the interests of Defendants ahead of the interests of the Company and its minority securities holders.  Defendants also have violated their fiduciary duties by refusing to consent to the tax credit sale without regard to the fairness of the transaction to Fannie Mae.  In intentionally acting with a purpose other than advancing the best interests of Fannie Mae, Treasury also acted in bad faith.

122.    Defendants knowingly, purposefully, deliberately, willfully, culpably, recklessly, negligently or with gross negligence, breached their fiduciary duties to the

Company's minority securities holders by committing, causing or permitting to be committed the acts complained of herein.

123.    As a result of the actions of Defendants, Fannie Mae has been injured and will be irreparably harmed.

124.    Unless Defendants are enjoined by the Court, Defendants will continue to breach their fiduciary duties owed to Fannie Mae and its minority securities holders and will not consent to the transaction.  Unless Defendants are required to satisfy their fiduciary duties, Fannie Mae and its minority securities holders will suffer irreparable harm.

125.    Plaintiff has no adequate remedy at law.  Only through the exercise of this Court's equitable powers can Fannie Mae be fully protected from the immediate and irreparable injury which Defendants' action threatens to inflict.

## SECOND CAUSE OF ACTION

### (Abuse of Control)

126.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

127.    Defendants engaged in the conduct alleged herein for the purpose of maintaining and entrenching themselves in their positions of power, prestige and control over Fannie Mae and to continue to receive the benefits of their refusal to consent to the transaction. Defendants' conduct constituted an abuse of their ability to control and influence Fannie Mae.

128.    By reason of the foregoing, Fannie Mae has been injured and will be irreparably harmed.

### THIRD CAUSE OF ACTION

### (Mismanagement)

129.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

130.    Defendants have a duty to Fannie Mae to prudently supervise, manage and control the operations, business and internal financial accounting and disclosure controls of the Company.

131.    Defendants, by engaging in the wrongdoing described herein, abandoned and abdicated their responsibilities and duties with regard to the prudent management of the business and financial condition of Fannie Mae in a manner consistent with the duties imposed on them by law.  By engaging in the misconduct alleged herein, Defendants breached their duties in the management of and administration of Fannie Mae's affairs and in the use and preservation of the Company's assets.

132.    During the course of the discharge of their duties, Defendants knew or recklessly disregarded the unreasonable risks and losses associated with their misconduct, yet Defendants breached their duties to the Company by engaging in the scheme complained of herein with knowledge or reckless disregard for the scheme's unreasonable risk of damage to Fannie Mae.

133.    By reason of the foregoing, Fannie Mae has been injured and will be irreparably harmed.

### FOURTH CAUSE OF ACTION

### (Waste of Corporate Assets)

134.    Plaintiff incorporates by reference and realleges each and every allegation set

forth above, as though fully set forth herein.

135.    By refusing to properly consider the interests of Fannie Mae and its minority securities holders, by failing to conduct proper supervision, and by refusing to consent to the sale of Fannie Mae's tax credits, Defendants have caused the Company to waste valuable corporate assets in violation of Defendants' fiduciary duties.

136.    As a result of Defendants' corporate waste, they are liable to the Company.

## PRAYER FOR RELIEF

WHEREFOR, Plaintiff demands judgment as follows:

A.    Declaratory and injunctive relief only in the form of an order, *inter alia*, declaring that Treasury, as controlling shareholder of Fannie Mae, has duties to Fannie Mae; ordering that Defendants refrain from further violations as alleged herein and implementing corrective measures that will rectify all such wrongs as have been committed and prevent their recurrence; enjoining Treasury's decision to not approve the sale of Fannie Mae's tax credits; and requiring Treasury to satisfy its fiduciary obligations in any further attempts by Fannie Mae to sell, auction or otherwise dispose of the Company's tax credits;

B.    Awarding costs and disbursements of this action, including reasonable attorneys', accountants' and experts' fees; and

C.    Granting such other and further relief as this Court may deem just and proper.

**JURY TRIAL DEMANDED**

Plaintiff demands a trial by jury as to all issues so triable.

Dated: February 15, 2013                    Respectfully submitted,

                                            **BERK LAW PLLC**


                              By: /s/ Steven N. Berk
                                  Steven N. Berk (D.C. Bar # 432870)
                                  2002 Massachusetts Avenue NW
                                  Suite 100
                                  Washington, District of Columbia  20036
                                  Telephone: (202) 232-7550
                                  Email:  steven@berklawdc.com

                                  Jordan L. Lurie
                                  (*Pro Hac Vice application pending*)
                                  Sue Kim
                                  (*Pro Hac Vice application pending*)
                                  Arvin Ratanavongse
                                  (*Pro Hac Vice application pending*)
                                  Capstone Law APC
                                  1840 Century Park East, Suite 450
                                  Los Angeles, California  90067
                                  Telephone: (310) 556-4811
                                  Facsimile:  (310) 943-0396

                                  Attorneys for Plaintiff

## VERIFICATION

I, Melanie Marmorstein, hereby verify and declare under penalty of perjury that I have reviewed the Complaint, know the contents thereof and authorize its filing, and that the foregoing is true and correct to the best of my knowledge, information and belief, based on investigation of counsel.

Dated: February 13, 2013

Melanie Marmorstein, Trustee, on
behalf of the Gail C. Sweeney Estate
Marital Trust