## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| ――――――――――――――――――――― ) | | |
| GAIL C. SWEENEY ESTATE MARITAL ) | | |
| TRUST, derivatively on behalf of ) | | |
| FEDERAL NATIONAL ) | | |
| MORTGAGE ASSOCIATION, ) | | |
| ) | | |
| Plaintiff, ) | | |
| ) | | |
| v. ) | Civil Action No. 13-206 (ABJ) | |
| ) | | |
| UNITED STATES TREASURY ) | | |
| DEPARTMENT, *et al.*, ) | | |
| ) | | |
| Defendants. ) | | |
| ――――――――――――――――――――― ) | | |

### MEMORANDUM OPINION

Plaintiff Gail C. Sweeney Estate Marital Trust has brought a shareholder derivative lawsuit on behalf of the Federal National Mortgage Association ("Fannie Mae") against defendants Fannie Mae, the United States Department of the Treasury ("Treasury"), Secretary of the Treasury Jacob J. Lew, the Federal Housing Finance Agency ("FHFA"), and FHFA Director Melvin L. Watt.[1]   Am. Compl. [Dkt. # 32].   Plaintiff asserts four counts in the amended complaint:  breach of fiduciary duty, abuse of control, mismanagement, and waste of corporate assets.  *Id.* ¶¶ 146–63.  Plaintiff seeks declaratory and injunctive relief, and attorneys' fees and costs.  Am. Compl., Prayer for Relief, ¶¶ A–B.

The FHFA is the Conservator of Fannie Mae, *id.* ¶ 26, and it has moved to substitute itself as plaintiff in this case, arguing that only the Conservator has standing to pursue claims on

―――――――――――――――

1   The amended complaint names Acting FHFA Director Edward J. Demarco as a defendant, but pursuant to Federal Rule of Civil Procedure 25(d), the Court has automatically substituted Director Watt in his stead.

behalf of Fannie Mae.  Renewed Mot. of FHFA as Conservator of Fannie Mae to Substitute for

Shareholder Derivative Pl. & Mem. of P. & A. in Supp. [Dkt. # 37] at 2 ("FHFA Mot.").

Plaintiff does not disagree that, as a general matter, only the Conservator has standing to sue on

behalf of Fannie Mae.  But plaintiff contends that in this case, the Conservator suffers from a

"manifest, disabling and irreconcilable" conflict of interest that prevents it from pursuing Fannie

Mae's interests, and that plaintiff should therefore be permitted to bring this action.  Am. Compl.

¶ 93; Pl.'s Opp. to FHFA Mot. & to Resp. of Defs. U.S. Dep't of Treasury & Sec'y of Treasury

[Dkt. # 41] at 1 ("Pl.'s Opp.").  The Court finds that there is not a "manifest, disabling and

irreconcilable" conflict of interest in this case and that plaintiff lacks standing to sue on behalf of

Fannie Mae, so it will grant the FHFA's motion to substitute.

## BACKGROUND

I.      **Factual Background**[2]

A.  *The Housing and Economic Recovery Act of 2008*

Congress enacted the Housing and Economic Recovery Act of 2008 ("HERA") in

response to the recent national housing market crisis.  HERA established the FHFA, an agency

charged with regulating Fannie Mae, the Federal Home Loan Mortgage Corporation ("Freddie

Mac"), and the Federal Home Loan Banks.  12 U.S.C. § 4511 (2012).  The statute also

empowered the Director of the FHFA to appoint the FHFA as the conservator or receiver for the

entities it regulates "for the purpose of reorganizing, rehabilitating, or winding up [their] affairs."

12 U.S.C. § 4617(a)(2) (2012).  HERA further provides that "no court may take any action to

---

2      The background facts of this case are not in dispute except where noted.  Although
neither party has directed the Court to a standard of review for motions to substitute under
HERA, the Court will construe the facts in favor of plaintiff, the non-moving party.

restrain or affect the exercise of powers or functions of the [FHFA] as a conservator or receiver."
*Id.* § 4617(f).

In another section of HERA that is relevant to the pending motion, Congress amended the charter of Fannie Mae to grant the Department of the Treasury "[t]emporary authority" to purchase "obligations and securities" of Fannie Mae by agreement between the two entities, as long as Treasury also considers the need to "protect the taxpayers."  12 U.S.C. § 1719(g) (2012).

B.  *The Appointment of FHFA as Conservator of Fannie Mae and the Treasury Agreements*

On September 6, 2008, the Director of the FHFA exercised his statutory authority to appoint the FHFA as Fannie Mae's Conservator.   Am. Compl. ¶ 26; *see also* 12 U.S.C. § 4617(a).  As Conservator, the FHFA succeeded to "all rights, titles, powers, and privileges of the regulated entity, and of any stockholder, officer, or director of [Fannie Mae]."  12 U.S.C. § 4617(b)(2)(A)(i).  The Conservator has the power to "[o]perate" Fannie Mae, to assume the "[f]unctions of officers, directors, and shareholders" of Fannie Mae, and to "take such action as may be – (i) necessary to put [Fannie Mae] in a sound and solvent condition; and (ii) appropriate to carry on the business of [Fannie Mae] and preserve and conserve [its] assets and property." *Id.* § 4617(b)(2)(B)–(D).

Starting on September 7, 2008, Fannie Mae, through its Conservator, entered into a series of Senior Preferred Stock Purchase Agreements with Treasury ("Treasury Agreements").[3]  Am. Compl. ¶ 43; *see also* 12 U.S.C. § 1719(g) (granting Treasury temporary authority to purchase "obligations and securities" of Fannie Mae).  Pursuant to the Treasury Agreements, Treasury received one million shares of senior preferred Fannie Mae stock, which carries a preference

---

3     There have been several amendments to the Treasury Agreements, but they are not material to this case.

with respect to dividends and a liquidation preference of at least $1 billion, but no voting rights. Am. Compl. ¶ 43; FHFA Mot. at 5–6.  In addition, Treasury acquired a warrant to purchase up to 79.9% of Fannie Mae's common stock.  Am. Compl. ¶ 43; FHFA Mot. at 7.

In exchange, Treasury agreed to make billions of dollars available to Fannie Mae to keep it solvent.  To date, Fannie Mae has received at least $116 billion from Treasury, and Treasury is obligated to make up to an additional $125 billion available.  Pl.'s Opp. at 13; FHFA Mot. at 6. The parties also agreed that the Conservator would not "sell, transfer, lease or otherwise dispose of" any assets outside the ordinary course of business without Treasury's written consent, subject to exceptions not relevant here.  FHFA Mot. at 5; *see also* Am. Compl. ¶ 44.

C.  *The Low-Income Housing Tax Credits*

In 2009, Fannie Mae owned low-income housing tax credits ("LIHTCs")[4] worth approximately $5.2 billion.  Am. Compl. ¶ 57; FHFA Mot. at 7.  But because Fannie Mae was not profitable at the time, it had no profits against which to offset the LIHTCs, and could not realize their value.  Am. Compl. ¶ 57; FHFA Mot. at 7.  Fannie Mae therefore sought to sell the LIHTCs, and it identified third-party investors interested in acquiring approximately $2.6 billion worth of the credits.  Am. Compl. ¶ 61; FHFA Mot. at 8.

Pursuant to the Treasury Agreements, though, Fannie Mae and the Conservator could not dispose of the LIHTCs without Treasury's written permission.  *See* FHFA Mot. at 5.  According to the complaint, Treasury declined to approve the sale twice – in November 2009 and February 2010 – finding that the sale would not ultimately protect or benefit the taxpayers.  Am. Compl.

---

4      According to plaintiff, the purpose of the low-income housing tax credits program is to spur the development of affordable housing by providing a tax break to investors in low-income housing projects.  Am. Compl. ¶¶ 55–56.

¶¶ 66, 73.[5]  Plaintiff alleges that Treasury's failure to consent to the sale constitutes a breach of its fiduciary duties as the purported "controlling shareholder" of Fannie Mae.  Am. Compl. ¶ 76. Through this derivative action, plaintiff seeks to step into the shoes of the Conservator and sue Treasury on behalf of Fannie Mae.

## II.    Procedural Background

Plaintiff filed its shareholder derivative complaint on February 15, 2013, Compl. [Dkt. # 1], and its amended complaint on June 25, 2013, Am. Compl.  The FHFA filed its motion to substitute on May 23, 2013, [Dkt. # 29], and a revised version of that motion on September 25, 2013, [Dkt. # 37].  Defendant Treasury filed a renewed response in support of the FHFA's revised motion October 28, 2013, [Dkt. # 40], and plaintiff filed a motion to strike one of the affidavits attached to Treasury's response on November 25, 2013, [Dkt. # 42].  The Court denied plaintiff's motion to strike on November 26, 2013, stating that it would consider plaintiff's objections in connection with its consideration of Treasury's pleading.  Nov. 26, 2013 Minute Order.  Plaintiff opposed the FHFA's motion on November 25, 2013, [Dkt. # 41], and the FHFA filed a reply on December 16, 2013, [Dkt. # 43].

## ANALYSIS

It is undisputed that the plain language of HERA provides that only the Conservator may bring suit on behalf of Fannie Mae.  *See* 12 U.S.C. § 4617(b)(2)(A)(i); *Kellmer v. Raines*, 674 F.3d 848, 850 (D.C. Cir. 2012).  But plaintiff argues that its shareholder derivative suit is nevertheless proper because a "manifest, disabling and irreconcilable" conflict of interest prevents the Conservator from suing Treasury over its refusal to consent to the sale of the

---

5    The FHFA's motion states that Treasury rejected the sale in February 2010, but makes no mention of a November 2009 rejection.  *See* FHFA Mot. at 8.

LIHTCs – a lawsuit that, in plaintiff's view, would be in the best interest of Fannie Mae.  Am. Compl. ¶ 93; Pl.'s Opp. at 1.  But the Court finds that there is no disabling conflict here that would permit plaintiff to assume the Conservator's function.  Furthermore, the clear statement in HERA that "no court may take any action to restrain or affect the exercise of powers or functions" of the Conservator, 12 U.S.C. 4617(f), suggests that the Court may not be empowered to authorize plaintiff to pursue litigation that the Conservator has declined to pursue.  Therefore, the Court will grant the Conservator's motion to substitute the FHFA as plaintiff in this case.

I.     **There is no "manifest, disabling and irreconcilable" conflict of interest in this case.**

The "language [of HERA] plainly transfers shareholders' ability to bring derivative suits . . . to FHFA." *Kellmer*, 674 F.3d at 850.  And no court has held that a conflict-of-interest exception applies to this provision.  But two courts have recognized a conflict-of-interest exception to HERA's predecessor statute:   the Financial Institutions Reform Recovery and Enforcement Act of 1989 ("FIRREA").  *See First Hartford Corp. Pension Plan & Trust v. United States*, 194 F.3d 1279 (Fed. Cir. 1999); *Delta Savings Bank v. United States*, 265 F.3d 1017 (9th Cir. 2001); *see also Kellmer*, 674 F.3d at 850 (noting that FIRREA is the "predecessor" of HERA and that "absent a manifest conflict of interest," all courts found that FIRREA barred shareholder derivative suits).  Plaintiff argues that under the specific facts of this case, the FIRREA conflict-of-interest exception should apply to HERA, and that it therefore has standing to bring its shareholder derivative suit.  But the Court finds that even if the exception were available under HERA, there is no conflict of interest that would justify its application in this case.

### A.  *First Hartford*

The authorities cited by plaintiff do not call for a different outcome.  The *First Hartford* case arises out of the following circumstances:  In 1983, Dollar Savings Bank of New York and Dry Dock Savings Bank merged to form Dollar Dry Dock Bank of New York ("Dollar"), a New York state-chartered bank.  194 F.3d at 1283.  As part of an effort to assist the struggling new bank, in 1986, the Federal Deposit Insurance Corporation ("FDIC") entered into an agreement with Dollar that required it to maintain a certain level of total capital.  *Id.*  The agreement further specified that the intangible asset of "goodwill" could count toward Dollar's minimum capital level requirement.[6]  *Id.* at 1283–84.

In 1990, the FDIC, the Superintendent of Banks for the State of New York ("Superintendent"), and Dollar executed an agreement that increased the amount of capital Dollar was required to have on hand.  *Id.* at 1284.  Then, in 1991, the FDIC promulgated rules that effectively prohibited Dollar from counting goodwill toward its total capital.  *Id.*  As a result, Dollar was no longer able to meet its capital requirements.  *Id.*  The Superintendent seized Dollar and appointed the FDIC as receiver.  *Id.*

First Hartford, a Dollar shareholder, brought suit on behalf of Dollar against the United States protesting the FDIC's raising of Dollar's capital requirements, the seizure of Dollar, and Dollar's loss of its contractual right to value goodwill as part of its total capital.  *Id.*  It sued for breach of contract and alleged that there had been an unconstitutional taking in violation of the Fifth Amendment.  *Id.*  First Hartford had submitted "multiple requests" to the FDIC asking it to

---

6       As the Federal Circuit explained, "'[g]oodwill' is defined as the excess of the cost to the acquirer of purchasing the financial institution . . . and the fair market value of the acquired financial institution's assets at the time of the acquisition."  *First Hartford*, 194 F.3d at 1283.  The goodwill at issue here is commonly referred to as "supervisory goodwill" because of the particular context of a supervisory merger of a failed financial institution.  *Id.* at 1283 n.1.

bring the lawsuit, and the FDIC repeatedly replied simply that it was considering the question. *Id.* at 1295.   First Hartford finally filed its own shareholder action one day before the statute of limitations expired.   *Id.*

The Court of Federal Claims dismissed First Hartford's complaint, in part on the grounds that only the FDIC, as receiver, could bring an action on behalf of the bank.   *Id.* at 1286.   The Federal Circuit reversed on that issue.   *Id.* at 1294.   The court found that the particular facts of this case warranted an exception to the "general proposition" that "the FDIC's statutory receivership authority includes the right to control the prosecution of legal claims on behalf of" Dollar.   *Id*. at 1295.   "[I]n the circumstances presented by this case," the court reasoned, "the FDIC was asked to decide on behalf of the depository institution in receivership whether it should sue the federal government based upon a breach of contract, which, if proven, was caused by the FDIC itself."   *Id*.   Given that "manifest conflict of interest," as well as the FDIC's "de facto refusal to sue," the court concluded that First Hartford had standing to bring a shareholder derivative suit.   *Id.*   The court cautioned that its holding was "very narrow" and "limited to the situation here in which a government contractor with a putative claim of breach by a federal agency is being operated by that very same federal agency."   *Id.*

### B. *Delta Savings Bank*

*Delta Savings Bank* is the only other case in which a court has applied the conflict-of-interest exception recognized in *First Hartford*.   *See* 265 F.3d at 1022.   In *Delta Savings Bank*, a failing bank was under investigation by the Office of Thrift Supervision ("OTS") and it came under increased scrutiny because of an alleged racially-motivated conspiracy among two OTS employees and a Delta employee.   *Id.* at 1019–20.   Delta's board of directors authorized "any and all action necessary to file Civil Litigation against any and all parties including the OTS" and

the individual employees, and several months later, the OTS removed the bank president and placed the bank under the conservatorship of the FDIC. *Id.* at 1020. The OTS also issued a Prohibition Order forever banning the former president, Young Il Kim, from working in the American banking industry. *Id.* That order was later vacated by the Ninth Circuit. *Id.*

Delta and Kim, in his individual and shareholder capacities, brought suit against the United States and the individual employees based on the OTS's failure to prevent the alleged discrimination by its employees. *Id*. The district court dismissed Kim's shareholder derivative claims on the ground that only the FDIC, as Delta's conservator, had standing to pursue claims on behalf of the bank. *Id.* But the Ninth Circuit found that, as in *First Hartford*, a "manifest conflict of interest" prevented the FDIC from bringing suit against the OTS. *Id.* at 1022. Therefore, the court held, Kim had shareholder standing under the conflict-of-interest exception. *Id*.

Unlike *First Hartford*, the *Delta Savings Bank* case involved two ostensibly separate agencies: the FDIC, Delta's conservator, and the OTS, which had investigated Delta and placed it into conservatorship. *Id*. Nevertheless, the court held that "the fact that this case involves separate federal agencies does not distinguish it from *First Hartford*" because the agencies were so closely "interrelated[ ]." *Id.* As proof of this interrelatedness, the court noted that:

- The Director of the OTS was, by statute, also a member of the Board of Directors of the FDIC. *Id.* at 1023, citing 12 U.S.C. § 1812(a)(1)(B).

- The OTS and the FDIC shared employees: "An employee of the OTS [could] simultaneously serve as a deputy or assistant to a member of the Board of Directors of the FDIC," and would be considered to be employed by the FDIC. *Id*., citing 12 U.S.C. § 1812(f)(2).

- The FDIC and the OTS jointly published regulations, issued reports, and conducted investigations. *Id.*

- Both the FDIC and the OTS were created by FIRREA. *Id.*

9

- The agencies "play[ed] complementary roles in the process of bailing out failing thrifts," and the OTS could appoint the FDIC as conservator or receiver. *Id.*

The court concluded that "[g]iven the nature and extent of the relationship between the FDIC and the OTS, . . . the FDIC cannot be expected to objectively pursue lawsuits against the OTS, even when it is in the best interest of the failing bank to do so." *Id*. Therefore, it found that the "common-sense[ ] conflict of interest exception to the commands of FIRREA" established in *First Hartford* applied in this case, giving the shareholder plaintiff standing to sue.[7] *Id.* at 1024.

**C. A conflict-of-interest exception, if available, is not appropriate in this case.**

Unlike *First Hartford* and *Delta Savings Bank*, the circumstances of this case do not justify the exception that plaintiff seeks. As an initial matter, the Court notes that neither *First Hartford* nor *Delta Savings Bank* is binding in this jurisdiction, and that even if they were, they are not HERA cases.[8] But assuming without deciding that the conflict-of-interest exception these cases recognized could also apply to HERA, the Court finds that it would not apply in this case. Therefore, plaintiff does not have standing to pursue its claims and the Court will grant the Conservator's motion to substitute.

Plaintiff argues that the conflict-of-interest exception would apply here because, "as a practical matter, Fannie Mae cannot be expected to objectively pursue a lawsuit against Treasury." Am. Compl. ¶ 94. As evidence of the agencies' excessive interrelatedness, plaintiff points out that:

---

7      The court ultimately disposed of the shareholder plaintiff's claims on other grounds. *Delta Savings Bank*, 265 F.3d at 1024.

8      In *Kellmer*, the D.C. Circuit acknowledged that the Ninth and Federal Circuits have recognized a conflict of interest exception in FIRREA cases. *See Kellmer*, 674 F.3d at 850. This statement in *Kellmer* neither establishes nor forecloses the existence of a conflict of interest exception for HERA.

- Treasury has already provided $116 billion to Fannie Mae, and is required by contract to make an additional $125 billion available.  Pl.'s Opp. at 13.

- The FHFA and Treasury entered into and implemented the Treasury Agreements together.  *Id.*

- Until August 2012, Treasury provided Fannie Mae with the funds to make its dividend payments, which were all owed to Treasury.  *Id.*  Treasury and Fannie Mae ended this "circular practice" in 2012, and established that Treasury would instead take "the entire positive net worth of [Fannie Mae] each quarter" as its dividend payment.  *Id.* at 14–15.

- Fannie Mae has indicated in filings with the Securities and Exchange Commission ("SEC") that it and Treasury are "related parties" as defined by Statement of Financial Accounting Standards No. 57.  *Id.* at 17.

- Treasury and Fannie Mae work together on the Home Affordable Modification Program ("HAMP"), with Fannie Mae serving as program administrator for loans modified under HAMP, and Treasury compensating Fannie Mae for that work.  *Id.* at 18.

- The Secretary of the Treasury holds one of the four seats on the Federal Housing Finance Oversight Board ("FHFOB"), which, by statute, exists to advise the Director of the FHFA.  *Id.* at 20 n.6; *see also* 12 U.S.C. § 4513a (2012).

Plaintiff also argues that because Fannie Mae has received billions of dollars from Treasury, "[i]t strains credulity to believe that Fannie Mae would bite the hand that fed it," and that, as in *Delta Savings Bank*, it is "impractical" and "absurd" to think that the FHFA would sue Fannie Mae.  Pl.'s Opp. at 2, 12.  It is impossible, plaintiff contends, for the FHFA to objectively assess whether it should sue Treasury because the FHFA "already has capitulated twice to Treasury" on the LIHTC issue.  *Id.* at 2.  In addition, plaintiff alleges that in May, 2013, Fannie Mae made a one-time dividend payment of approximately $60 billion to Treasury "so that Treasury could pump up its financial results to avoid the federal debt ceiling."  *Id.* at 16.  According to plaintiff, that dividend payment "really is an accounting artifice" and it "further evidences the interrelatedness between Fannie Mae and Treasury."  *Id.*

Even taking plaintiff's factual allegations as true, plaintiff's arguments fail because they do not establish a conflict of interest similar to the ones at issue in *First Hartford* and *Delta*

*Savings Bank.*  First, the holding of *First Hartford* is "limited to the situation . . . in which a government contractor with a putative claim of breach by a federal agency is being operated by that very same federal agency."  194 F.3d at 1295.  Given that plaintiff here states that its "action is directed at Treasury . . . not the FHFA," Pl.'s Opp. at 24, there can be no question that the alleged breach was not committed by the conservator agency.  Therefore, the obvious conflict at issue in *First Hartford* is not present here, and that case's reasoning does not support plaintiff's claims.

Second, *Delta Savings Bank*, too, is inapposite.  In that case, the Ninth Circuit applied the conflict-of-interest exception that was articulated in *First Hartford*, even though the conservator of the bank was not the agency that had allegedly harmed it, as was the case in *First Hartford.*[9] The court reasoned that the circumstances of *Delta Savings Bank* could "not [be] distinguish[ed] from *First Hartford*" because the OTS and the FDIC were so intertwined.  265 F.3d at 1022.  In other words, the Ninth Circuit found that the two ostensibly separate agencies were so closely related that it was *as if* Delta Savings Bank were being operated by a single agency, the agency that harmed it, as in *First Hartford*.

The FHFA and Treasury, however, are not virtually the same agency.   Unlike the agencies in *Delta Savings Bank*, they do not share employees and directors, and they were not created by the same statute to serve complementary functions.  *See id*. at 1023.  The Department of the Treasury is a Cabinet-level agency established by the First Congress in 1789 that, by plaintiff's own description, is "charged with, *inter alia*, managing federal finances, supervising national banks and thrift institutions, and advising on domestic and international financial, monetary, economic, trade and tax policy."  *See* Am. Compl. ¶ 23.   The FHFA, by contrast, was

---

9       The Court notes that this was a significant expansion of what the court in *First Hartford* expressly warned was supposed to be a "very narrow" holding.  *See* 194 F.3d at 1295.

established by the 110th Congress in 2008 through the HERA statute, and it is authorized to regulate and act as conservator or receiver for Fannie Mae, Freddie Mac, and the Federal Home Loan Banks.  12 U.S.C. § 4511.

Furthermore, in *Delta Savings Bank*, the would-be defendant, the OTC, appointed the FDIC as the bank's conservator, and that was a factor leading the court to conclude that the entities were intertwined.  But Fannie Mae is not a bank, and would-be defendant Treasury did not appoint the FHFA as Conservator.  Congress passed legislation and created a new agency to deal specifically with Fannie Mae, as well as Freddie Mac and the Federal Home Loan Banks. 12 U.S.C. § 4511.  Pursuant to that statutory authority, the Director of the FHFA appointed the FHFA as Conservator of Fannie Mae.  *See id.* § 4617(a).  In other words, the conflict in *Delta Savings Bank*, where the plaintiff sought to sue the agency that had appointed the conservator, is absent here.

Moreover, it is particularly significant to this analysis that Treasury and the FHFA are counterparties to a contract that was authorized by Congress in the HERA statute.  In that contract, Treasury agreed to provide billions of dollars to Fannie Mae in exchange for stock and the right to ensure that Fannie Mae used its assets wisely.  *See* 12 U.S.C. § 1719(g)(1)(A) (granting Treasury authority to purchase "any obligations and other securities" of Fannie Mae upon "mutual agreement between the Secretary and the corporation").  The fact that the two entities occupy opposite sides of a contract, which is supported by consideration and requires each to perform in accordance with its terms, differentiates this situation from the OTS–FDIC relationship described in *Delta Savings Bank*.

Plaintiff's theory that the FHFA and Treasury are so interrelated that the FHFA "cannot be expected to objectively pursue a lawsuit against Treasury" arises primarily out of the

relationship created by this contract.  *See* Am. Compl. ¶ 94.  But plaintiff's central claim – that the FHFA would never "bite the hand that fed it" by suing its source of funding – is undermined by the contract, since Treasury is obligated to provide funding whether or not it is sued.  *See* Pl.'s Opp. at 2; Am. Compl. ¶ 43.  And the fact that the FHFA acquiesced to Treasury's disapproval the LIHTC sale suggests little more than that the FHFA abided by the terms of its contract with Treasury.

The rest of plaintiff's arguments fall similarly flat.  In support of its claim that Treasury and the FHFA are excessively intertwined, plaintiff notes that the FHFA has "admitted" that it and Treasury are "related parties" in SEC filings.  Pl.'s Opp. at 17.  Statement of Financial Accounting Standards No. 57 defines "related party" to include a party that "has an ownership interest in one of the transacting parties and can significantly influence the other to an extent that one or more of the transacting parties might be prevented from fully pursuing its own separate interests."  App. B, Ex. J to Resp. of Treasury Defs. to FHFA Mot. [Dkt. # 40-6] ¶ f; *see also* Pl.'s Opp. at 17.  Fannie Mae reported to the SEC that it was "related" to Treasury under that definition because Treasury holds a warrant to purchase 79.9% of the shares of its common stock.  Ex. K to Resp. of Treasury Defs. to FHFA Mot. [Dkt. # 40-7] at 90 (Fannie Mae Form 10-Q for the period ending June 30, 2013).  Treasury has not exercised that warrant, however, and the Conservator succeeded to all of the powers of all shareholders under HERA, so the "related party" designation does not indicate a conflict of interest here.

Plaintiff also points out that Treasury compensates Fannie Mae for its role in implementing the HAMP program, that the Secretary of the Treasury advises the Director of the FHFA as a member of the FHFOB, that Treasury takes all of Fannie Mae's profits as dividends, and that Fannie Mae, through its Conservator, made a large one-time dividend payment to

Treasury.  Pl.'s Opp. at 14–16, 18, 20 n.6.  But nothing about Treasury's compensation of Fannie Mae for administering HAMP could create a conflict of interest that affects this case when Treasury is contractually obligated to provide funding to Fannie Mae through the FHFA in any event.  And the official advisory role of the Secretary of the Treasury is not, on its own, sufficient to create a "manifest conflict of interest," nor does it reflect the level of interconnectedness at issue in *Delta Savings Bank*, where the director of the OTS sat on the board of directors of the FDIC.  *See* 265 F.3d at 1022–23.  Finally, the Court sees nothing extraordinary about arrangements that enable Fannie Mae to repay to Treasury some portion of the $116 billion in taxpayer funds that it has borrowed so far.[10]  *See* Pl.'s Opp. at 13.

In sum, this case does not present the type of "manifest conflict of interest" at issue in either *First Hartford* or *Delta Savings Bank*.  Rather, it appears that plaintiff's true objection is to the terms of the Treasury Agreements, which plaintiff does not challenge in its complaint, and

---

[10]     Plaintiff makes the conclusory claim that the FHFA has abandoned its mandate to "preserve and conserve" the assets of Fannie Mae.  Pl.'s Opp. at 16.  It points to public statements by the FHFA, set forth in paragraphs 115 and 116 of the amended complaint, that purportedly demonstrate that the FHFA has adopted Treasury's "agenda" of protecting taxpayers.  *Id.* at 3, 15–16, citing Am. Compl. ¶ 115 ("With taxpayers providing the capital supporting [Fannie Mae's] operations, this mandate to preserve and conserve directs FHFA to minimize losses on behalf of taxpayers."); *id.* at ¶ 116 ("FHFA has reported on numerous occasions that, with taxpayers providing capital supporting Enterprise operations, this 'preserve and conserve' mandate directs FHFA to minimize losses on behalf of taxpayers.") (emphasis omitted).  But these statements simply reflect that taxpayer dollars have been utilized to support Fannie Mae.  Furthermore, the extent of Fannie Mae's indebtedness to Treasury (and the taxpayers) negates plaintiff's insinuation that Treasury vetoed the sale of the LIHTCs because "every dollar of tax credits used reduces tax revenue to Treasury," Am. Compl. ¶ 9, and that Treasury is "unjustly enriching itself at the expense or to the detriment of [Fannie Mae's] minority shareholders." *Id.* ¶ 46.

which were authorized by Congress in HERA.  Therefore, the Court will grant the Conservator's

motion to substitute.[11]

## II.        The anti-injunction provision of HERA also bars plaintiff's claims.

In addition to granting broad powers to the FHFA as Conservator, HERA contains an

anti-injunction provision that prevents courts from "tak[ing] any action to restrain or affect the

exercise of powers or functions of the [FHFA] as a conservator or a receiver."  12 U.S.C.

§ 4617(f).  Every circuit court to consider the issue has held that this provision strips courts of

jurisdiction to hear challenges to the "lawful exercise of FHFA's power as conservator."[12]  *Cnty.*

*of Sonoma v. FHFA*, 710 F.3d 987, 990 (9th Cir. 2013); *see also Leon Cnty. v. FHFA*, 700 F.3d

1273, 1279 (11th Cir. 2012); *Town of Babylon v. FHFA*, 669 F.3d 221, 228 (2d Cir. 2012); *La.*

*Mun. Police Emps. Ret. Sys. v. FHFA*, 434 F. App'x 188, 191 (4th Cir. 2011) (per curiam).  The

Court finds that this provision provides a second, independent basis for its decision to grant the

Conservator's motion to substitute.

Plaintiff does not argue that the FHFA's failure to bring suit against Treasury over the

LIHTC issue was outside the scope of the FHFA's powers as the Conservator of Fannie Mae.

---

11       Without reaching the issue of demand futility, the Court notes that this case is also unlike
*First Hartford* and *Delta Savings Bank* because plaintiff here has not attempted to ask the FHFA
or Fannie Mae's Board of Directors to sue Treasury over the LIHTC sale issue.  *See First
Hartford*, 194 F.3d at 1295 (noting First Hartford's "multiple requests" to the FDIC); *Delta
Savings Bank*, 265 F.3d at 1020 (noting that Delta's board of directors had authorized the
litigation before Delta was placed into conservatorship); Am. Compl. ¶¶ 80–92 (stating that
demand on the Fannie Mae Board of Directors would be futile because the Board is "beholden"
to the Conservator, because the Conservator has succeeded to all of the Board's powers, and
because of the Conservator's "manifest, disabling and irreconcilable conflicts of interest with
respect to this action").

12       FIRREA contains a parallel anti-injunction provision.  *See* 12 U.S.C. § 1821(j).  In a
different factual context, the D.C. Circuit stated that FIRREA's anti-injunction provision
"effect[s] a sweeping ouster of courts' power to grant equitable remedies" against the FDIC
when it acts within its powers as receiver.  *Freeman v. FDIC*, 56 F.3d 1394, 1399 (D.C. Cir.
1995).

Nor could it:  whether or not to spend Fannie Mae's assets on a lawsuit against Treasury is plainly the type of business decision Congress entrusted to the Conservator in HERA.  *See* 12 U.S.C. § 4617(b)(2)(D), (D)(ii) (empowering the FHFA as Conservator to "take such action as may be . . . appropriate to carry on the business of the regulated entity and preserve and conserve the assets of the regulated entity").  Rather, plaintiff claims that its suit does not run afoul of section 4617(f) because its "action is directed at Treasury . . . not the FHFA."  Pl.'s Opp. at 24. Moreover, plaintiff says, it does not seek to "*interfer[e]*" with the FHFA's powers, but to liberate it to "*do precisely what it intended to do*" before Treasury rejected the LIHTC sale.  *Id.* (emphasis in original).

But "[a] court action can 'affect' a conservator even if . . . the litigation is not directly aimed at the conservator itself."  *In re Fed. Home Loan Mortg. Corp. Derivative Litig.*, 643 F. Supp. 2d 790, 799 (E.D. Va. 2009).  And since the Conservator has succeeded to "all rights, titles, powers, and privileges of . . . any stockholder, officer, or director" of Fannie Mae, 12 U.S.C. § 4617(b)(2)(A)(i), only the Conservator has the power to bring suit on behalf of Fannie Mae.  *Kellmer*, 674 F.3d at 850.  Thus, to permit plaintiff to bring an action which the conservator has declined to bring "would interfere with and potentially usurp precisely the powers granted to the FHFA by HERA."  *Esther Sadowsky Testamentary Trust v. Syron*, 639 F. Supp. 2d 347, 351 (S.D.N.Y. 2009).  Given that the FHFA undisputedly acted within the scope of its authority as Conservator and that plaintiff's lawsuit would "affect" and "interfere" with the

Conservator's exercise of its powers, the plain language of section 4617(f) requires the Court to grant the Conservator's motion to substitute.[13]

## CONCLUSION

The Court finds that this case does not present a conflict of interest sufficient to justify an exception to HERA's command that only Fannie Mae's Conservator may bring suit on Fannie Mae's behalf.  Therefore, the Court will grant the Conservator's motion to substitute for plaintiff in this case.  A separate order will issue.

AMY BERMAN JACKSON
United States District Judge

DATE:  September 19, 2014

---

13      Plaintiff claims that the conflict-of-interest exception established for the FIRREA statute in *First Hartford* and *Delta Savings Bank* is also an exception to section 4617(f) of HERA.  Like HERA, FIRREA contains a broad anti-injunction provision that eliminates a court's power to "restrain or affect the exercise of powers or functions of the [FDIC] as a conservator or a receiver," 12 U.S.C. § 1821(j), and despite this provision, the Federal Circuit and the Ninth Circuit permitted shareholder derivative suits to proceed in *First Hartford* and *Delta Savings Bank*.  It is unclear how those courts squared their decisions with the anti-injunction provision of FIRREA because neither court addressed it.  But since the Court has already determined that the circumstances that might justify a conflict-of-interest exception to HERA are not present here, plaintiff's argument is unavailing.